■ PAUL M. ELLINGTON, Appellant, v EMI MUSIC INC. et al., Defendants, and EMI MILLS MUSIC, INC., Respondent. [964 NYS2d 141]—

Appeal from order, Supreme Court, New York County (Bernard J. Fried, J.), entered October 11, 2011, which granted a motion by defendant EMI Mills Music, Inc. to dismiss the amended complaint pursuant to CPLR 3211 (a) (1) and (7), deemed an appeal from judgment, same court and Justice, entered December 7, 2011, dismissing the complaint (CPLR 5501 [c]), and, so considered, the judgment unanimously affirmed, without costs.

This breach of contract action was brought to recover royalties allegedly due under a December 17, 1961 songwriter royalty agreement. The agreement designates the legendary Edward Kennedy Ellington, known professionally as Duke Ellington, and named members of his family (collectively Ellington) as the "First Parties." A group of music publishers consisting of Mills Music, Inc., American Academy of Music, Inc., Gotham Music Service, Inc., their predecessors in interest and any other affiliate of Mills Music are collectively designated as the "Second Party" under the agreement. EMI Mills is the successor in interest to Mills Music. According to the amended complaint, plaintiff is suing as Duke Ellington's heir and grandson.

This appeal calls for an interpretation of paragraph 3 (a) of the agreement which, where relevant, required the Second Party to pay Ellington "a sum equal to fifty (50%) percent of the net revenue actually received by the Second Party from . . . foreign publication" of Ellington's compositions. This is known in the

music publishing industry as a "net receipts" arrangement by which a composer, such as Ellington, would collect royalties based on income received by a publisher after the deduction of fees charged by foreign subpublishers (*see e.g. Jobim v Songs of Universal, Inc.*, 732 F Supp 2d 407, 413 [SD NY 2010]). As stated in plaintiff's brief, "net receipts" arrangements were standard when the agreement was executed in 1961. Plaintiff also notes that at that time foreign subpublishers were typically unaffiliated with domestic publishers such as Mills Music. Over time, however, EMI Mills, like other publishers, acquired ownership of the foreign subpublishers through which revenues derived from foreign subpublications were generated. Accordingly, in this case, fees that previously had been charged by independent foreign subpublishers under the instant net receipts agreement are now being charged by subpublishers owned by EMI Mills.* Plaintiff asserts that EMI Mills has enabled itself to skim his claimed share of royalties from the Duke Ellington compositions by paying commissions to its affiliated foreign subpublishers before remitting the bargained-for royalty payments to Duke Ellington's heirs. In dismissing the complaint, the motion court declined to read into the royalty payment terms any distinction between affiliated and unaffiliated foreign subpublishers inasmuch as the contracting parties themselves chose not to make such a distinction. We affirm.

Plaintiff asserts that the agreement is ambiguous as to whether "net revenue actually received by the Second Party" entails revenue received from EMI Mills's foreign subpublisher affiliates. Although it was raised for the first time on appeal, we entertain plaintiff's ambiguity argument as it poses a question of law that could not have been avoided if raised before the motion court (*see Delgado v New York City Bd. of Educ.*, 272 AD2d 207 [1st Dept 2000], *lv denied* 95 NY2d 768 [2000], *cert denied* 532 US 982 [2001]).

An agreement is unambiguous "if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion' " (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [citation omitted]). Conversely, an agreement is ambiguous if "on its face [it] is reasonably susceptible of more than one interpretation"

---

* As also stated in plaintiff's brief, "at source" agreements have replaced "net receipts" agreements as the music publishing industry standard since around 1980. Under an "at source" arrangement, royalty payments to the artist are based on the grand total of earned music publishing revenue with all costs of collection absorbed by the publisher.

(see *Chimart Assoc. v Paul*, 66 NY2d 570, 573 [1986]). Guided by these precedents, we find no ambiguity in the agreement which, by its terms, requires EMI Mills to pay Ellington's heirs 50% of the net revenue actually received from foreign publication of Ellington's compositions. "Foreign publication" has one unmistakable meaning regardless of whether it is performed by independent or affiliated subpublishers. Given the plain meaning of the agreement's language, plaintiff's argument that foreign subpublishers were generally unaffiliated in 1961, when the agreement was executed, is immaterial.

A court's "role in interpreting a contract is to ascertain the intention of the parties *at the time they entered into the contract*" (*Evans v Famous Music Corp.*, 1 NY3d 452, 458 [2004] [emphasis added]). We note that the complaint contains no allegation of any change in the basis for payment of royalties, i.e., 50% of the net revenue derived from foreign publication. Moreover, the complaint sets forth no basis for plaintiff's apparent premise that subpublishers owned by EMI Mills should render their services for free although independent subpublishers were presumably compensated for rendering identical services. Notwithstanding plaintiff's argument, we note that the motion court correctly determined that the agreement's definition of "Second Party" included only the parties named therein and "other affiliates of Mills Music, Inc." that were in existence at the time the agreement was executed. The definition did not include foreign subpublishers that had no existence or affiliation with Mills Music at the time of contract (*see VKK Corp. v National Football League*, 244 F3d 114, 130-131 [2d Cir 2001]). We have considered plaintiff's remaining arguments and find them unavailing. Concur—Mazzarelli, J.P., Andrias, DeGrasse, Richter and Clark, JJ. **[Prior Case History: 33 Misc 3d 1209(A), 2011 NY Slip Op 51827(U).]**