| |
|---|
| **Nardelli v Zletz** |
| 2024 NY Slip Op 31097(U) |
| April 2, 2024 |
| Supreme Court, New York County |
| Docket Number: Index No. 155049/2020 |
| Judge: James E. d'Auguste |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 55

---------------------------------------------------------------------X

JACKSON C. NARDELLI,

                                Plaintiff,

               - v -

RICHARD S. ZLETZ,

                              Defendant.

---------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 155049/2020 |
| **MOTION DATE** | 10/14/2020 |
| **MOTION SEQ. NO.** | 001 |

**DECISION + ORDER ON
MOTION**

Hon. James E. d'Auguste:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66

were read on this motion to/for           SUMMARY JUDGMENT (AFTER JOINDER)    .

      This action is premised on an option agreement ("Option Agreement") between plaintiff

Jackson Nardelli's deceased father, Joseph Nardelli ("Joseph"), and defendant Richard Zletz

("Zletz"), an attorney licensed to practice law in New York for more than thirty years.  According

to plaintiff, in the Option Agreement, Zletz lent Joseph $3,000, pursuant to two transactions, so

that Joseph could stave off an imminent default to his co-op.  In exchange, Zletz obtained an option

to buy Joseph's apartment ("Bank Street Apartment"), which was worth at least $650,000.

Plaintiff alleges that the grossly one-sided nature of this loan transaction violates New York's civil

and criminal usury laws.  However, defendant alleges that the Option Agreement is not usurious

because it contains a scrivener's error, and that, when read correctly, it is a valid and binding

agreement.

      Plaintiff now moves, pursuant to CPLR 3212, for summary judgment on the first and

second causes of action in the complaint for a declaration stating the Option Agreement transaction

**155049/2020  NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No.  001**

Page 1 of 22

is null and void as a matter of law, and that Zletz has no legal interest in the Bank Street Apartment. Plaintiff also seeks summary judgment on his third cause of action for defendant's alleged conversion of Joseph's loan collateral.

Defendant cross-moves for an order: (1) dismissing the complaint pursuant to CPLR 3211 (a) (1) and (a) (7); and (2) granting summary judgment on his first counterclaim for a declaration: (a) that the Option Agreement is reformed to correct the scrivener's error; and (b) that the Option Agreement is not usurious and is enforceable; (3) granting summary judgment on its second counterclaim for an injunction requiring plaintiff's specific performance with the Option Agreement; (4) granting summary judgment on defendant's fourth counterclaim for a money judgment against plaintiff for the unpaid balance of the two loans, including interest, costs and expenses (including attorneys' fees) thereon. Alternatively, defendant seeks an order granting summary judgment on its fifth counterclaim for a declaratory judgment that it is the rightful owner of the film given as security for the two loans.

For the reasons set forth below, defendant's motion is granted to the limited extent that the first cause of action is dismissed. The remainder of defendant's motion is denied, as is plaintiff's motion, as issues of fact preclude the granting of either motion.

## FACTS

### The Parties

Plaintiff is an individual residing at 156 Bank Street, Apartment 2B, New York, New York 10014, in the West Village Houses ("WVH") (Jackson Nardelli aff [NYSCEF Doc 12], ¶ 3). Plaintiff inherited the Bank Street Apartment after the death of his father, Joseph (*id.*, ¶ 4). Zletz is an individual residing at 125 Barrow Street, Apartment 4A, New York, New York 10014 (answer [NYSCEF Doc No. 8], ¶ 9).

**155049/2020  NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No.  001**

**Page 2 of 22**

2 of 22

[* 2]

**Joseph and Zletz Rent Apartments in the WVH and Become Shareholders After the Complex Converts to a Co-Op**

Prior to March 2006, Joseph and Zletz each rented apartments in the WVH, a government subsidized housing complex (Nardelli aff, ¶ 5). Joseph worked as a Parent Coordinator for the NYC Board of Education and was an independent film maker (*id.*, ¶ 6). Zletz is an attorney who graduated from Duke Law School, and has been admitted to practice law in New York State since 1987 (*see* NYS Attorney Registration Database [NYSCEF Doc No. 17]; *see also* answer ¶ 12.2).

The WVH consists of a number of walkup apartments in Manhattan, on land stretching from Morton Street on the south to Bank Street on the north and bounded by West Street on the west and Washington Street on the east (answer, ¶ 14). The WVH apartments were opened in 1974 as a middle income housing development financed by the New York State's Mitchell-Lama program for middle income housing (*see* class action complaint against the WVH [NYSCEF Doc No. 16], ¶ 15). As a Mitchell-Lama development, the apartments in the WVH were subject to certain rent restrictions, and residents were required to have incomes below certain levels (*id.*, ¶ 16). Based on the modest income that he earned as a filmmaker and parent coordinator, Joseph satisfied the WVH's income restrictions (Nardelli aff, ¶¶ 6-7).

After 20 years, the Mitchell Lama program permits the owners of a Mitchell Lama development to remove the development from the program, and raise the rents in the development to market level (class action complaint, ¶ 17). Beginning in 2004, the WVH owner and the West Village Housing Tenants' Association negotiated terms under which the WVH would convert into a co-op owned by the WVH Co-Op (*id.*, ¶ 18).

On March 9, 2006, the co-op conversion process was completed, and the WVH became the WVH Co-Op (*id.*, ¶ 29). At that time, Joseph and Zletz became shareholders in the WVH Co-

**155049/2020 NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
Motion No. 001

Page 3 of 22

[* 3]

Op: Joseph bought the 401 shares corresponding to the Bank Street Apartment, and Zletz bought the shares corresponding to 125 Barrow Street, Apt. 4A (Nardelli aff, ¶ 9; answer, ¶ 24).

As shareholders, Joseph and Zletz were each entitled to occupy their respective apartments, and were subject to the terms of a proprietary lease ("Proprietary Lease") for the WVH Co-Op (Nardelli aff, ¶11; answer, ¶ 25). Under the Proprietary Lease, shareholders could not sell their apartments for more than a specified amount, known as the "Maximum Sale Price Restriction" (answer, ¶ 27). The Maximum Sale Price Restriction increased each year on the anniversary date of the co-op conversion, March 9, 2006 (*id.*). Due to the Maximum Sale Price Restrictions in the Proprietary Lease, Joseph faced the following sale price caps for sale of the Bank Street Apartment:

- Between March 9, 2016 and March 8, 2017: $549,422.89

- Between March 9, 2017 and March 8, 2018: $609,859

- Starting on March 9, 2018: No Price Restriction

(Proprietary Lease excerpts [NYSCEF Doc No. 18], at 152-155).

Plaintiff alleges that, as a filmmaker and layman, Joseph had little familiarity with the legal requirements associated with the conversion and operation of a New York co-op (Nardelli aff, ¶ 10).

**In Exchange for a $3,000 Loan from Zletz, Joseph Signs the Option Agreement, the Power of Attorney, Two Promissory Notes, and Surrenders the Ono Film to Zletz as Loan Collateral**

Zletz and Joseph were friends (answer, ¶ 30). By 2016, Joseph's personal finances had taken a turn for the worse, and he had fallen behind on the mortgage payments for his apartment and maintenance payments to the WVH Co-Op (Nardelli aff, ¶ 13; Option Agreement [NYSCEF Doc No. 20], at 1). Joseph confided in Zletz about his personal financial difficulties (answer, ¶ 35).

**155049/2020 NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
Motion No. 001

Page 4 of 22

4 of 22

[* 4]

By early March 2016, Joseph owed $3,000 in maintenance charges to the WVH Co-Op, and he was late on mortgage payments for the Bank Street Apartment (Nardelli aff, ¶¶ 13-15; Option Agreement, at 1). On March 7, 2016, the WVH Co-Op informed Joseph that it intended to declare him in default of his obligations, and to commence eviction proceedings against him if he did not pay his overdue maintenance by March 21, 2016 (Nardelli aff, ¶ 14; Option Agreement, at 1). To avoid a default, Joseph was required to pay $500 by March 11, 2016 and $2,500 by March 21, 2016 (Nardelli aff, ¶ 15; Option Agreement, at 1).

In March 2016, Zletz lent $3,000 to Joseph in consideration for Joseph signing a number of legal documents and providing loan collateral (answer, ¶¶ 44, 51, 65-71, 76; *see* Option Agreement; *see also* Power of Attorney Form [NYSCEF Doc No. 21). On March 11, 2016, Zletz lent Joseph $500 so Joseph could make his overdue maintenance payment due on that day (answer, ¶ 44). On March 21, 2016, Zletz lent Joseph an additional $2,500 so he could make another overdue maintenance payment (answer, ¶¶ 51, 65, 67; Option Agreement, at 1). In exchange for his $3,000 loan, Zletz prepared and presented to Joseph the Option Agreement, which included two promissory notes, and the Power of Attorney Form (*see id.*).

On March 21, 2016, Zletz and Joseph signed the Option Agreement, pursuant to which Zletz obtained an option to purchase the Bank Street Apartment for $650,000 (Option Agreement, at 3). Zletz could exercise this option any time within a one-year term (the Option Term) beginning on March 9, 2018 (*id.*). Although the Option Agreement specifically provides that, if Zletz declined to exercise his option to purchase the Bank Street Apartment, Joseph then would be compelled to sell the Bank Street Apartment "for a fair market value to a bona fide third party, with [Zletz] receiving the first $650,000" (*id.*), defendant contends that this was a scrivener's error, and that the parties intended that Joseph, rather than Zletz, was to receive the first $650,000.

155049/2020 NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.
Motion No. 001

Page 5 of 22

5 of 22

As part of the Option Agreement, Joseph signed two promissory notes (*id.* at 7-10 [Option Agreement Exhibit A]; *id.* at 11-14 [(Option Agreement Exhibit B]). The first promissory note was for the $500 that Zletz had lent Joseph on March 11, 2016 (*id.* at 7-10). It specified that the loan was for one month, and that Joseph would pay annual interest of 5%, which equaled an interest payment of $2.83 over a one month period (*id.*). The second promissory note concerned Zletz's $2,500 loan made on March 21, 2016 (*id.* at 11-14). That loan was also made for one month, with an annual interest rate of 5% (*id.*). At the end of the one-month term, Joseph would owe Zletz a total of $14.15 in interest payments (*id.* at 14).

Each Promissory Note specified that Joseph was required to provide Zletz with a documentary film (the Ono Film) as security for Zletz's loan (*see id.* at 9, 13). Consistent with the terms of the promissory notes, Joseph surrendered the Ono Film to Zletz as collateral for the loans that he received (Nardelli aff, ¶ 16; answer, ¶ 69-70).

As part of the Option Agreement transaction, Zletz prepared a Power of Attorney Form, which he and Joseph signed on March 21, 2016 (answer, ¶ 76; Power of Attorney Form at 5-6). In the Power of Attorney Form, Zletz designated himself as Joseph's agent (*id.*). As Joseph's agent, Zletz gave himself the right to (1) "effectuate the sale of the [Bank Street Apartment] to [] Zletz ... or to a bona fide third party purchaser in accordance with the Option Agreement;" (2) "to renovate or upgrade the [Bank Street Apartment];" and (3) "to sublet the [Bank Street Apartment]" in certain circumstances" (*id.* at 3).

**Zletz Encumbers the Bank Street Apartment with a UCC Filing**

On September 27, 2016, Zletz filed a UCC form (the UCC Form [NYSCEF Doc No. 22) with the New York City Department of Finance (answer, ¶ 84). In the UCC Form, Zletz stated

**155049/2020  NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No. 001**

**Page 6 of 22**

6 of 22

[* 6]

that he was a secured party with an interest in the Bank Street Apartment based on the Option Agreement and the Promissory Notes (UCC Form, at 2; answer, ¶ 86).

**Plaintiff Inherits the Bank Street Apartment**

On May 5, 2018, Joseph passed away (Nardelli aff, ¶ 17). On October 11, 2018, plaintiff was appointed executor and sole heir of Joseph's estate (*id.*, ¶ 18). In his will, Joseph bequeathed his shares in the WVH Co-Op to plaintiff (*id.*). On about November 6, 2019, the WVH Co-Op Board approved the transfer of the Joseph's shares to plaintiff (*id.*, ¶ 20).

**Zletz Exercises His Option to Purchase the Bank Street Apartment**

On February 8, 2019, Zletz sent a letter to plaintiff stating that he was exercising his option to purchase the Bank Street Apartment under the Option Agreement (*see* 2/8/19 Zletz Letter to Nardelli [NYSCEF Doc No. 23]). Zletz urged plaintiff to contact his attorneys within a week to make arrangements so that Zletz could buy the Bank Street Apartment (*id.*). Plaintiff declined to move forward as suggested by Zletz (Nardelli aff, ¶ 19).

In late 2019, plaintiff arranged for an appraisal of the Bank Street Apartment by Mid Atlantic Realty Advisors (Mid Atlantic) (*id.*, ¶ 21). In its appraisal report (the Appraisal Report [NYSCEF Doc No. 25), Mid Atlantic found that the Bank Street Apartment had a value of $1,045,000 as of November 16, 2019 (*id.*; *see* Appraisal Report at 3).

In late December 2019, the WVH Co-Op notified its shareholders that it was transitioning into a free-market cooperative, and would be issuing new stock certificates and a new proprietary lease to each shareholder (answer, ¶ 96). On February 21, 2020, Zletz's counsel objected to the WVH Co-Op issuing plaintiff a new stock certificate or a new proprietary lease (*see* 2/21/20 Finkelstein Letter to Truskowski [NYSCEF Doc No. 24). Zletz's counsel stated that Zletz had the right to obtain the new stock certificate and new proprietary lease based on the Option Agreement

**155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No. 001**

**Page 7 of 22**

7 of 22

[* 7]

(*see id.* at 1) In the same letter, Zletz's attorneys informed that they were "in the process of commencing suit" to compel plaintiff to sell the Bank Street Apartment to Zletz (*id.* at 2).

After receiving Zletz's letter, the WVH Co-Op told plaintiff that it would be holding his new stock certificate and proprietary lease for the Bank Street Apartment in escrow until he and Zletz resolved the objections raised by Zletz (Nardelli aff, ¶ 22).

**Additional Facts Contained in Joseph's Hospice Statement**

Shortly before his death, when he was in hospice care, Joseph prepared a statement (the Hospice Statement [NYSCEF Doc No. 64]). According to this statement, Zletz prepared the Option Agreement without any input from Joseph (*id.* at 1-2). Zletz presented the Option Agreement to Joseph on the day before Joseph was going to default on his financial obligations to the WVH Co-Op (*id.* at 4). Zletz knew that Joseph was about to default, as Joseph had considered Zletz to be his friend, and had shared the details of his financial troubles with him (*id.* at 1-2, 4). With only one day before his default, Joseph did not have enough time to vet and understand the Option Agreement and Power of Attorney Form (*id.* at 6).

Based on what he thought was his friendship with Zletz, Joseph trusted Zletz to prepare a "fair and equitable option agreement" (*id.* at 10). Joseph agreed to sign the documents because Zletz said that he would "be easy on [him]" and that the $650,000 option price to buy the Bank Street Apartment could be renegotiated later (*id.* at 2). Zletz also told Joseph that he didn't need an attorney because he could confer with one after the Option Agreement was signed (*id.* at 2).

Consistent with Zletz's advice to him, Joseph did not seek the advice of an attorney until after the Option Agreement was signed, when he contacted a friend who was a matrimonial attorney (*id.* at 2). Joseph was stunned when his attorney called him "a f\*\*king idiot" for signing the agreement (*id.*). Joseph at first tried to convince his attorney that his friendship with Zletz

**155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
Motion No.  001

**Page 8 of 22**

would lead to a fair final agreement (*id.*). Joseph later discovered that his views about Zletz were misplaced (*id.*). After signing the Option Agreement and Power of Attorney Form, Joseph found out that Zletz was surreptitiously recording the phone calls between the two of them to use as potential evidence in case he needed it (*id.* at 5).

## DISCUSSION

"'[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact'" (*Ayotte v Gervasio*, 81 NY2d 1062, 1063 [1993] [citation omitted]; *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). The burden is a heavy one: the facts must be viewed in the light most favorable to the non-moving party and every available inference must be drawn in the non-moving party's favor (*Sherman v New York State Thruway Auth.*, 27 NY3d 1019, 1021 [2016]). "Failure to make such showing requires denial of the motion, regardless of the sufficiency of the opposing papers" (*Winegrad*, 64 NY2d at 853; *see also Lesocovich v 180 Madison Ave. Corp.*, 81 NY2d 982 [1993]).

The party opposing summary judgment has the burden of presenting evidentiary facts sufficient to raise triable issues of fact (*Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]; *CitiFinancial Co. [DE] v McKinney*, 27 AD3d 224, 226 [1st Dept 2006]). Summary judgment may be granted only when it is clear that no triable issues of fact exist (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]), and "is inappropriate in any case where there are material issues of fact in dispute or where more than one conclusion may be drawn from the established facts" (*Friends of Thayer Lake LLC v Brown*, 27 NY3d 1039, 1043 [2016]; *see also Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404 [1957]; *Tronlone v Lac d'Amiante Du Quebec*, 297 AD2d 528, 528-529 [1st Dept 2002], *affd* 99 NY2d 647 [2003]).

**155049/2020  NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No. 001**

**Page 9 of 22**

[* 9]

9 of 22

"To successfully raise the defense of usury, a debtor must allege and prove by clear and convincing evidence that a loan or forbearance of money, requiring interest in violation of a usury statute, was charged by the holder or payee with the intent to take interest in excess of the legal rate" (*Blue Wolf Capital Fund II, L.P. v Am. Stevedoring Inc.*, 105 AD3d 178, 183 [1st Dept 2013], citing *Giventer v Arnow*, 37 NY2d 305, 309 [1975]). "If usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law" (*id.* [affirming trial court issuance of summary judgment based on finding that loan documents established that transaction was usurious]; *see also Roopchand v Mohammed*, 154 AD3d 986, 987-89 [2d Dept 2017] [same]).

**RPAPL Article 15 (First Cause of Action)**

In the first cause of action, plaintiff seeks a judgment under the Real Property and Proceedings Law (the RPAPL), Article 15, declaring that (a) Zletz has no rights or legal interest in the Bank Street Apartment, based on the Option Agreement, Promissory Notes, or otherwise; and (b) Zletz must promptly rescind the UCC Form (complaint [NYSCEF Doc No. 1], ¶¶ 101-07). Plaintiff alleges that he is entitled to such a judgment because Zletz's sole basis for interfering with his use of the Bank Street Apartment is based on an Option Agreement that, on its face, violates the usury laws.

However, the first cause of action must be dismissed because the relief sought cannot be granted under RPAPL Article 15 since it concerns personal property, not real property. RPAPL Article 15 may form the basis for relief "[w]here a person claims an estate or interest in real property" (*see* RPAPL § 1501[1]). However, RPAPL Article 15 does not apply to claims involving personal property (*see generally Belott v State*, 49 Misc 2d 501 [Sup Ct, Saratoga County 1966]). It is well settled that "[s]hares of stock issued in connection with cooperative apartments are

**155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
Motion No.  001

Page 10 of 22

10 of 22

personal property, not real property" (*Lombard v Station Square Inn Apts. Corp.*, 94 AD3d 717, 718 [2d Dept 2012]; *see also Matter of Pollack*, 18 AD3d 555, 557 [2d Dept 2005] ["Cooperative apartments are personal property, not real property"]). In that regard, "RPAPL § 1501(1), pursuant to which this action was commenced, does not apply to shares in a cooperative apartment" (*523-527 W. 143rd St. Hous. Dev. Fund Corp. v U.S. Bank Natl. Assn.*, 2015 NY Slip Op 30516[U], * 2 [Sup Ct, NY County 2015]).

*523-527 W. 143rd St.* involved claims to a low-income Housing Development Fund Corporation apartment, similar to the Mitchell Lama apartment at issue here. There, Justice Kern held that "the court finds that for purposes of RPAPL § 1501(1), shares in a cooperative apartment are personal property rather than real property and that any action to determine the enforceability of defendant's security interest in the shares must be brought pursuant to Article 9 rather than the RPAPL" (*id.*). Accordingly, the RPAPL Article 15 claims were dismissed.

Plaintiff's first cause of action must likewise be dismissed, as it seeks a judgment under RPAPL Article 15 with respect to an interest in a cooperative apartment. Thus, as a matter of law, plaintiff is not entitled to and cannot receive a judgment under RPAPL Article 15 with respect to his interest in shares of stock in a cooperative apartment. Accordingly, the first cause of action must be dismissed in its entirety.

**Declaratory Judgment that the Option Agreement is Null and Void (Second Cause of Action)**

Plaintiff also moves for summary judgment on his second cause of action for declaratory judgment, in which he seeks a declaration that: (1) the Option Agreement violates New York's usury laws, and is legally null and void; and (2) he has no obligation to repay any principal or interest pursuant to the Option Agreement or Promissory Notes (complaint, ¶¶ 108-117).

**155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No.  001**

**Page 11 of 22**

Zletz cross-moves for an order granting summary judgment on his first counterclaim for a declaration: (a) that the Option Agreement is reformed to correct the scrivener's error, and (b) that the Option Agreement is not usurious and is enforceable. Zletz also cross-moves for summary judgment on his second counterclaim for an injunction requiring plaintiff's specific performance with the Option Agreement.

However, because there are clear and obvious issues of fact with respect to both parties' claims, summary judgment must be denied.

Under CPLR § 3001, "[t]he supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy." "The general purpose of a 'declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations'" (*Touro Coll. v Novus Univ. Corp.*, 146 AD3d 679, 679 [1st Dept 2017] [citation omitted]). It is appropriate when the dispute concerns "'present, rather than hypothetical, contingent or remote, prejudice to plaintiff'" (*id.* at 680 [citation omitted]; *see also Long Is. Light. Co. v Allianz Underwriters Ins. Co.*, 35 AD3d 253, 253 [1st Dept 2006] [noting that declaratory judgment is proper when there is "'an actual controversy between genuine disputants with a stake in the outcome'"] [citation omitted]).

The declaratory judgment sought by plaintiff presents an actual, justiciable controversy regarding the parties' rights under the Option Agreement. After plaintiff inherited the Bank Street Apartment, Zletz informed him that he was exercising his alleged right under the Option Agreement to purchase the Bank Street Apartment (Nardelli aff, ¶ 18; see 2/8/19 letter). Following plaintiff's refusal to sell him the apartment, Zletz's attorneys wrote to the WVH Co-Op and claimed that Zletz had ownership rights over the Bank Street Apartment based on the Option

155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.
Motion No.  001

Page 12 of 22

Agreement. In response, the WVH Co-Op has refused to issue a new share certificate or a new proprietary lease to Jackson Nardelli until the legal claims made by Zletz are resolved (Nardelli aff, ¶ 22).

However, neither party is entitled to the declaratory judgment that they each seek with respect to the Option Agreement. It is well settled that contracts violating New York's usury laws are void as a matter of law (*see e.g. Blue Wolf*, 105 AD3d at 182-84 [holding that loan transaction that effectively charged annual interest of 57.14% was void for violation of usury laws]; *Bakhash v Winston*, 134 AD3d 468, 469 [1st Dept 2015] [holding that note effectively charging 36% annual interest is "is usurious as a matter of law and, therefore is void"]; *Roopchand*, 154 AD3d at 989 [holding that promissory note charging 50% interest per annum was "usurious on its face" and void]).

When a party seeks summary judgment on the ground that loan documents violate the usury laws, a court must determine whether "usury can be gleaned from the face of an instrument" (*Blue Wolf*, 105 AD3d at 183). If so, an intent to violate the usury laws "will be implied and usury will be found as a matter of law" (*id.*). "'Where usury does not appear on the face on the note, usury is a question of fact'" (*Adar Bays, LLC v GeneSYS ID, Inc.*, 37 NY3d 320, 336 [2021] [citation omitted]).

"Usurious intent" is "an essential element of usury" (*Freitas v Geddes Sav. & Loan Assn*, 63 NY2d 254, 262 [1984]). "[B]ecause a usurer usually seeks to conceal the usury, and to accomplish the purpose by indirect methods, questions of usurious intent and whether a transaction is a cover for usury are typically questions of fact" (*Adar Bays*, 37 NY3d at 339 [citations, quotation marks and alteration omitted]). "To determine whether a transaction is usurious, courts look not to its form but to its substance or real character (*Blue Wolf*, 105 AD3d at 183). When

**155049/2020  NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
Motion No. 001

**Page 13 of 22**

loan transaction documents specify that the lender will receive a payment "in the event of a contingency beyond the borrower's control, the contingent payment constitutes usury within the meaning of the usury statute" (*id.*). Courts treat all such contingent payments as interest to the lender, and will declare a loan "void and unenforceable" if the effective interest rate exceeds the maximum civil annual interest rate of 16% or the maximum criminal annual interest rate of 25% (*id.* at 183-84).

Furthermore, "where usury has occurred, 'the borrower can simply keep the borrowed funds and walk away from the agreement'" (*Roopchand*, 154 AD3d at 988 [citation omitted]; *see also Venables v Sagona*, 85 AD3d 904, 905 [2d Dept 2011] ["A usurious contract is void and relieves the borrower of the obligation to repay principal and interest thereon"]).

Here, the plain language of Option Agreement, as it now reads, makes clear that Zletz's loan transaction is usurious. For his part, Zletz loaned only $3,000 to Joseph (answer, ¶¶ 44, 51, 65, 67; Option Agreement, at 2). In exchange, Zletz received a right to cash or property worth at least $650,000 (Option Agreement, at 3). Pursuant to the Option Agreement, as written, if Zletz elected not to exercise his option, Joseph would then be compelled to sell the Bank Street Apartment to a third party and pay the first $650,000 of the sales proceeds to the optionee – Zletz (*id.*). Since Zletz had complete discretion regarding whether or not he would elect to exercise the option, the $650,000 that he stood to receive counts as effective interest for his loan (*Blue Wolf*, 105 AD3d at 183). By receiving $650,000 for his $3,000 loan, Zletz stood to receive effective interest at a rate greater than 10,000% -- a rate that exceeds New York's criminal usury rate of 25% by 400 times and exceeds New York's civil usury rate of 16% by more than 600 times.

However, in opposition to the motion, and in support of his cross-motion for summary judgment, Zletz contends that the transaction is not usurious, because one of the Option

155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.
Motion No.  001

Page 14 of 22

Agreement's key economic terms – providing for payment of $650,000 to him – was a "scrivener's error" that confuses the opaque identifiers "Optionor" and "Optionee," that should be "reformed" by the court (*see* defendant's memorandum at 10 [NYSCEF Doc No. 58). More specifically, Zletz contends that the terms "Optionor" and "Optionee" are reversed in error in the third full paragraph on page 3 of the Option Agreement, which states:

> "Optionor and Optionee hereby agree that in the event that Optionee fails to exercise said option or on before March 9, 2019, or in the event that said option is timely exercised by Optionee and/or his family members and/or his assigns, but the Corporation does not permit the ***Optionor*** and/or his family members and/or his assigns to purchase the shares attributable to, or become a lessee of the Corporation with respect to, the Apartment, the Optionor has agreed to sell the Apartment for fair market value to a bona fide third party, with the Optionee receiving the first $650,000, out of which he will pay a proportionate share of all cost and expenses associated with the sale, including without limitation, taxes, and flip taxes, and the balance of the sales price shall go to the ***Optionee***, out of which he will pay costs and expenses, including, without limitation, all taxes and flip tax attributable to the amount in excess of $650,000"

(Option Agreement, at 3 [emphasis added]).

Zletz contends that, when read in context of the entire Option Agreement, as well as the negotiations and Term Sheet that preceded the agreement, it is clear that the conflation of "Optionor" and "Optionee" was a mutual mistake that can be corrected by the court, does not justify voiding the Option Agreement and does not make the Option Agreement usurious. Zletz argues that, if the Option Agreement were to be rewritten in this way, he would not have been in a position to receive excessive interest for his loan, and the contract would not violate the usury laws.

"A scrivener's error constitutes a mistake solely in the reduction of an agreement to writing" (*Rosalie Estates, Inc. v Colonia Ins. Co.*, 227 AD2d 335, 337 [1st Dept 1996]). It is undisputed that "'[w]here there is no mistake about the agreement and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no

155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.
Motion No. 001

Page 15 of 22

15 of 22

matter how it occurred, may be corrected'" (*Harris v Uhlendorf*, 24 NY2d 463, 467 [1969] [citation omitted]). "Reformation based upon a scrivener's error requires proof of a prior agreement between parties, which when subsequently reduced to writing fails to accurately reflect the prior agreement" (*US Bank N.A. v Lieberman*, 98 AD3d 422, 424 [1st Dept 2012]). The parties' course of performance under the contract, or their practical interpretation of a contract for any considerable period of time, is the most persuasive evidence of the agreed intention of the parties (*Gulf Ins. Co. v Transatlantic Reins. Co.,* 69 AD3d 71, 85 [1st Dept 2009]).

However, it is also undisputed that New York law has long recognized that "there is a heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties, and a correspondingly high order of evidence is required to overcome that presumption" (*Chimart Assoc. v Paul*, 66 NY2d 570, 574 [1986] [citations, quotations marks and alteration omitted]). This high standard aims to protect against "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different oral contract" (*id. at* 573). Thus, "[r]eformation on grounds of mutual mistake requires proof, by clear and convincing evidence, that an agreement does not express the intentions of either party" (*US Bank N.A.*, 98 AD3d at 424; *accord 313–315 W. 125th St. L.L.C. v Arch Specialty Ins. Co.*, 138 AD3d 601, 602 [1st Dept 2016] ["A claim for reformation of a written agreement must be grounded upon either mutual mistake or fraudulently induced unilateral mistake," and "(t)o succeed, the party seeking relief must establish by clear, positive and convincing evidence that the agreement does not accurately express the parties' intentions"] [citations and quotation marks omitted]).

Accordingly, to avoid dismissal by pretrial motion, the proponent of a contract reformation claim must "come forward with something more than his own conclusory assertion that mistake

existed" (*Chimart Assoc.*, 66 NY2d at 575). He must also "show in no uncertain terms ... exactly what was really agreed upon between the parties," and his supporting affidavits must be uncontradicted (*id.* at 574 [citation and quotation marks omitted]; *see also New York First Ave. CVS, Inc. v Wellington Tower Assoc., L.P.*, 299 AD2d 205, 295 [1st Dept 2002] ["The party resisting pre-trial dismissal of a reformation claim must tender a high level of proof in evidentiary form, free of contradiction or equivocation"] [quotation marks and citation omitted]).

When these standards are not satisfied, controlling New York precedent mandates that any contract reformation claim be rejected as a matter of law (*see e.g. Chimart Assoc.*, 66 NY2d at 573-75 [affirming summary judgment and rejecting reformation claim where opposing party's counsel submitted affidavit stating that opposing party did not have same mutual understanding claimed by proponent with respect to allegedly mistaken term]; *Resort Sports Network Inc. v PH Ventures III, LLC*, 67 AD3d 132, 136 [1st Dept 2009] [affirming summary judgment where proponents failed to show that the opposing party had same mutual understanding with regard to purported contractual mistake]; *New York First Ave. CVS*, 299 AD2d at 206 [affirming pre-trial order rejecting reformation claim where "(a)t most, plaintiff's submissions establish a unilateral mistake on its part"]).

In support of his argument for reformation of the Option Agreement, Zletz claims that he and Joseph purportedly made a "mutual mistake" in the Option Agreement by specifying that Zletz was to receive the first $650,000 if Joseph were compelled to sell the Bank Street Apartment to a third party (*see* defendant's memorandum, at 10; Zletz aff, ¶¶ 94, 96, 108). Zletz contends that he and Joseph had actually agreed that Joseph was to receive the first $650,000 from any sale (*see id.*).

**155049/2020 NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No. 001**

**Page 17 of 22**

17 of 22

However, Zletz's submissions are insufficient to make out a prima facie case for reformation, as there are issues of fact as to whether the language contained in the Option Agreement was a mutual mistake. As alleged proof of the mutual mistake, Zletz's papers include a series of conclusory statements asserting that Zletz and Joseph had agreed that the first $650,000 from a third-party sale would be distributed to Joseph (*see* defendant's memorandum, at 10 ["the agreement was that if Joseph () sold the stock and lease for the (Bank Street Apartment) to a third-party, then Joseph () would keep the first six hundred and fifty thousand [$650,000] dollars of the sale proceeds"]; Zletz aff ¶ 96 ["the clear intent and understanding of Joseph and me ... was that ... Joseph would keep the first $650,000 of any proceeds from a third-party sale"]). These statements, however, fail to support summary judgment as Zletz must "come forward with something more than his own conclusory assertion that mistake existed" (*Chimart Assoc*, 66 NY2d at 574). Zletz fails to provide any proof that these purported "mistakes" were mutual, i.e., that Joseph agreed to anything other than the contract as written. This alone is fatal to his argument (*see id.* at 575, *Resort Sports*, 67 AD3d at 136; *New York First Ave. CVS*, 299 AD2d at 206).

Zletz further argues that that this clear purpose and intent is reflected in the second "WHEREAS" clause on page 2 of the Option Agreement which states that: "the first $650,000 shall go to the Optionor [Joseph] and the balance of the sale price to the Optionee [Zletz]" (Option Agreement, at 2). However, it is axiomatic that "a statement in a 'whereas' clause ... cannot create any right beyond those arising from the operative terms of the document" (*Grand Manor Health Related Facility, Inc. v Hamilton Equities Inc.*, 65 AD3d 445, 447 [1st Dept 2009]; *see also Dee Cee Assoc. LLC v 44 Beehan Corp.*, 148 AD3d 636, 641 [1st Dept 2017] ["as a matter of law, a 'whereas' clause cannot create a new right"]). Contrary to Zletz's argument, the 'whereas' recitals do not form any part of the parties' actual agreement, which in this case is set forth in the operative

**155049/2020 NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No. 001**

**Page 18 of 22**

[* 18]

18 of 22

clauses after the "NOW THEREFORE" paragraph. Consequently, the conflicting statement in the 'whereas' clause does not, as a matter of law, override the operative clause stating that the first $650,000 from any sale was to be paid to Zletz.

Thus, given the need for "clear, positive and convincing evidence" of mutual mistake, and given the fact that Zletz has failed to come forward with any evidence as to Joseph's intentions or his interpretation of the Option Agreement, there are "issues of fact as to whether there was mutual mistake and/or a scrivener's error," that require the denial of both motions for summary judgment (*Empery Asset Master, Ltd. v AIT Therapeutics, Inc.*, 197 AD3d 1064, 1064–65 [1st Dept 2021]; *see also Warberg Opportunistic Trading Fund L.P. v GeoResources, Inc.*, 151 AD3d 465, 470-471 [1st Dept 2017] [finding issues of fact as to mutual mistake that precluded summary judgment on reformation]). Indeed, it is entirely possible that Zletz simply made a unilateral mistake when exchanging the terms "Optionee" and Optionor." If so, Zletz is precluded from reforming the contract based on his own "unilateral mistake" (*New York First Ave. CVS*, 299 AD2d at 206).

Accordingly, this court "cannot conclude, as a matter of law, that a reasonable person" reviewing the Option Agreement, especially one who is not a lawyer, would have realized that the words Optionor and Optionee should have been exchanged on the third page (*Empery Asset Master, Ltd.*, 197 AD3d at 1065).

Although Zletz also tries to support his mutual mistake theory based on a term sheet document (the Zletz Term Sheet [NYSCEF Doc No. 40]) that he has submitted (*see* defendant's memorandum, at 10, 14), this submission only raises further issues of fact. As Zletz concedes, "[re]formation based upon a scrivener's error requires proof of a prior agreement between parties, which when subsequently reduced to writing fails to accurately reflect the prior agreement" (*id.* at 11, citing *US Bank*, 98 AD3d at 424). However, the Zletz Term Sheet does not reflect the

155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.
Motion No.  001

Page 19 of 22

19 of 22

[* 19]

agreement in the Option Agreement. Instead, it concerns a different possible deal – where, among other things, Zletz was proposing lending $50,000 to Joseph instead of $3,000, as in the Option Agreement (*compare* Zletz Term Sheet, at 2, ¶3, *with* Option Agreement, at 2-3). Moreover, the Zletz Term Sheet does not even reflect a final agreement. The document contains blanks and bracketed amounts for basic deal terms, such as the option price which is noted as "[$610,000]" (*see* Zletz Term Sheet, at 2, ¶ 3). Because the Zletz Term Sheet reflects only discussions about a different possible deal – which was apparently abandoned – it cannot be used to as evidence to reform the Option Agreement (*US Bank*, 98 AD3d at 424). Indeed, as noted in the Hospice Statement, Zletz gave Joseph the Option Agreement only on the day before it was signed, and he did not permit any changes to be made (*see* Hospice Statement, at 2-3). Based on this compressed timeline, it is unclear whether the parties had an opportunity to enter into any prior agreement.

Finally, "an equitable remedy like reformation is unavailable to a party with unclean hands" (*Blue Wolf*, 105 AD3d at 184), and this court finds that there are issues of fact as to whether Zletz's conduct during the loan transaction constituted unclean hands (*see Tiozzo v Dangin*, 197 AD3d 435, 438 [1st Dept 2021]; *Hauser v Hauser*, 162 AD3d 992, 994 [2d Dept 2018]). The record reveals that reveals that Zletz prepared the operative documents and did not present Joseph with the Option Agreement and Power of Attorney Form until the day before he was going to default on his financial obligations to the WVH Co-Op (*see* Hospice Statement, at 1-2). As a non-lawyer, Joseph likely did not have time to vet and understand these legal documents in the single day before he needed to sign them to avoid a default to his co-op. Zletz also told Joseph that he did not need an attorney because he could confer with one after the Option Agreement was signed and assured Joseph that he "would be easy on him" and that the contract pricing terms could be

**155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No.  001**

Page 20 of 22

[* 20]

20 of 22

renegotiated (*see id.*). This court finds that these actions on the part of Zletz raise issues of fact as to whether his conduct constituted unclean hands, so that reformation would be unavailable to him.

Accordingly, because, on this record, this court is unable to establish, prima facie, whether the Option Agreement contained a mutual mistake, there are issues are fact as to whether the Option Agreement is usurious. Hence, both parties' motions for summary judgment on their claims relating to whether or not the Option Agreement is a legal nullity are denied.

**Conversion (Third Cause of Action)**

In the third cause of action, plaintiff asserts a claim for conversion based on Zletz's wrongful taking of the Ono Film in connection with the Option Agreement (*see* complaint, ¶¶ 118-124), and seeks summary judgment on this claim.

Zletz cross-moves for summary judgment on his fourth counterclaim for a money judgment against plaintiff for the unpaid balance of the two loans or, alternatively, for an order granting summary judgment on its fifth counterclaim for a declaratory judgment that it is the rightful owner of the Ono Film, given as security for the two loans.

"'A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession'" (*Reif v Nagy*, 175 AD3d 107, 120 [1st Dept 2019] [citation omitted]). "'Two key elements of conversion are (1) plaintiff's possessory right or interest in the property; and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights'" (*id.* [citation omitted]).

If the Option Agreement transaction is a legal nullity, as plaintiff claims, all loan documents, including the collateral agreement, are "void and unenforceable" (*Blue Wolf*, 105 AD3d at 184). However, because there are issues of fact as to whether the Option Agreement is a

**155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.**
**Motion No. 001**

Page 21 of 22

21 of 22

[* 21]

legal nullity, both parties' motions for summary judgment as to the two loans, and the collateral for the two loans, must also be denied.

Accordingly, it is

ORDERED that defendant's cross-motion to dismiss is granted to the limited extent that the first cause of action in the complaint is dismissed, and is denied in all other respects; and it is further

ORDERED that plaintiff's motion for summary judgment is denied.

Dated: April 2, 2024

ENTER:

_____
Hon. James E. d'Auguste, J.S.C.

155049/2020   NARDELLI, JACKSON C. vs. ZLETZ, RICHARD S.
Motion No. 001

Page 22 of 22